**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MELISSA L. ECHTERLING** | |
| **Plaintiff,** | **No. 14 C 9289** |
| **v.** | **Magistrate Judge Mary M. Rowland** |
| **CAROLYN W. COLVIN, Acting Commissioner of Social Security,** | |
| **Defendant.** | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Melissa L. Echterling filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq., 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Plaintiff urges reversal of the Commissioner's decision and remand with an order to award benefits. The Commissioner seeks reversal and remand for new proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB) or receive Supplemental Security Income (SSI), a claimant must establish that he or she is disabled within the mean-

ing of the Act.[1] *York v. Massanari*, 155 F. Supp. 2d 973, 978 (N.D. Ill. 2001). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standard for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 29, 2010, alleging that she became disabled on January 16, 2008, due to back injury, herniated disks, and social anxiety. (R. at 19, 252, 294). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 19). On June 10, 2013, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 19, 46–86, 89, 95). The ALJ also heard testimony from Amanda Rebecca Ortman, a vocational expert (VE). (*Id.*).

The ALJ denied Plaintiff's request for benefits on July 2, 2013. (R. at 19–37). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity during the period from her alleged onset date of January 16, 2008, through her date last insured of September 30, 2012. (*Id.* at 21). At step two, the ALJ found that Plaintiff's mild lumbar disc bulge, anxiety, depression, and posttraumatic stress disorder were severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 21–23).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work except:

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

[Plaintiff] cannot climb ladders, ropes, or scaffolds; can have no expo-
sure to heights or hazards, such as dangerous moving machinery; and
can follow simple instructions and perform routine tasks with simple
work-related decisions in a low stress work environment, which I de-
fine as no public interaction and occasional interaction with coworkers.

(R. at 23). At step four, the ALJ determined that Plaintiff was unable to perform

any past relevant work. (*Id.* at 35). Based on Plaintiff's RFC, age, education, and

the VE's testimony, the ALJ determined at step five that there are jobs that exist in

significant numbers in the national economy that Plaintiff can perform, including

sorter and packager. (Id. at 35–36). Accordingly, the ALJ concluded that Plaintiff

was not suffering from a disability, as defined by the Act. (Id. at 36).

The Appeals Council denied Plaintiff's request for review on September 23, 2014.

(R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as

the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th

Cir. 2009).

In her brief in support of her motion for summary judgment, (Dkt. 22, Plaintiff's

Brief), Plaintiff requests that the Court remand for an award of benefits based on a

theory that there are no outstanding factual issues and that the only possible find-

ing on the record is that Plaintiff is disabled. (*Id.* at 11–15). In the alternative,

Plaintiff requests remand for new proceedings based on other alleged errors. (*Id.* at

15–21). In her Response to Plaintiff's Brief, the Commissioner concedes that the

ALJ's analysis contained impermissible gaps. However, she disputes Plaintiff's con-

tention that remand for an award of benefits is the proper remedy and instead re-

quests remand for the resolution of factual disputes. (Dkt. 35).

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record . . . or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff has a ninth-grade education and has worked as a front-end manager in a crafts store and as a manager at two restaurants. (R. at 52–56). She was in a motor vehicle collision in 2007, after which she experienced lower back pain radiating down to her left buttock, with decreased sensation in the left calf. (*Id.* at 417). A CT scan performed October 9, 2007, showed "mild disc bulge" at L4–L5 and L5–S1. (*Id.* at 406, 418–19, 422–23). In September and October 2007, Plaintiff's pain was treated with medications, including Vicodin and Celebrex, and two left-sacroiliac-joint injections. (*Id.* at 415–23).

The relevant period for the purposes of Plaintiff's current claim is January 2008 through September 2012. There is extensive evidence documenting Plaintiff's numerous visits to the emergency room and to her doctors throughout that period, but only those records relevant to her current claim are summarized here. Plaintiff reported upper back pain in November 2008; X-rays of her thoracic spine were normal. (R. at 460, 464). Plaintiff reported back pain after falls in March and October

2009. (*Id.* at 653, 711). She reported neck and shoulder pain after sneezing in November 2009. (*Id.* at 651, 695, 697). In January 2010, she continued to experience back and hip pain and was diagnosed with sciatica. (*Id.* at 467, 652). A lumbosacral MRI performed on January 25, 2010, displayed "very mild" central bulging of the L4–L5 intervertebral disc, and a "mild central protrusion" of the disc at L5–S1. (*Id.* at 670). Nerve conduction tests performed on Plaintiff's left leg on January 26, 2010, were normal. (*Id.* at 668–69). In April 2010, she was taking Celebrex and Vicodin for pain and required physical therapy for the problems with her discs. (*Id.* at 463–64). In an October 2010 emergency room visit, Plaintiff reported left shoulder pain and low back pain that had persisted for two days. (*Id.* at 680).

In her first visit to primary care physician Katrina Cordero, M.D., in November 2010, Plaintiff reported low back pain and anxiety with panic attacks. (R. at 442–45). Dr. Cordero prescribed alprazolam (Xanax) and an acetaminophen and hydrocodone pain reliever. (*Id.* at 445). In December 2010, Plaintiff's back pain was causing her to wake up three or four times a night, and her Xanax dosage was "not strong enough" to control her anxiety. (*Id.* at 448–49). Dr. Cordero increased her Xanax dose. (*Id.*). Notes from a January 2011 follow-up visit indicate that Plaintiff's mood had improved. (*Id.* at 446).

On March 8, 2011, psychologist Jeffrey Karr, Ph.D., performed a psychological consultative examination of Plaintiff in connection with her application for benefits. (R. at 490–93). She reported a history of chronic anxiety and stated that she became anxious around crowds and strangers, going out principally when she believed it

would not be crowded. (*Id.*). Her anxiety caused tremors, dizziness, rapid heartbeat, concentration problems, and an inability to relax. (*Id.* at 491). She reported taking Xanax, Wellbutrin, Elavil, and pain medication, all prescribed by her family doctor. (*Id.* at 491). She spoke coherently with appropriate eye contact and was able to perform a series of cognitive tasks and arithmetic. (*Id.* at 492). Dr. Karr listed her diagnoses as post-traumatic stress disorder, anxiety disorder, and a history of back injury. (*Id.* at 493).

On March 15, 2011, Plaintiff returned to the emergency room with additional low back pain, indicating that she had fallen down stairs five or six days earlier; an X-ray was normal. (R. at 795, 800). On March 25, 2011, Plaintiff reported to Dr. Cordero that she had numbness in her feet if she spent too long sitting down and that she had pain down her left side. (*Id.* at 525).

On March 28, 2011, consulting psychologist Ellen Rozenfeld, Psy.D., after reviewing Dr. Karr's examination report and other materials in Plaintiff's file, prepared a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment. (R. at 494–511). She assessed Plaintiff as having PTSD and a nonspecified anxiety disorder causing a mild restriction in her activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (*Id.* at 499, 504–05). She opined that Plaintiff had no significant limitation in most work-related mental capacities, except she was moderately limited in four areas: the ability to work in coordination or proximity to others without being distracted by them, the ability to interact ap-

propriately with the general public, the ability to accept instructions or respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.* at 508–09). Dr. Rozenfeld then explained that Plaintiff retained sufficient cognitive capacity to remember work locations and work-related procedures and had the capacity to understand and remember instructions for both simple and detailed tasks. She also retained sufficient attention and concentration to persist at and complete activities for extended periods, and was able to perform at a regular rate with only the usual breaks and without special supervision. As to Plaintiff's limitations, Dr. Rozenfeld opined that her "ability to interact with and get along with the general public, coworkers and supervisors [was] moderately limited but adequate for occasional contact." (*Id.* at 510).

April 2011 treatment notes indicate that Dr. Cordero continued to prescribe Xanax plus an acetaminophen/hydrocodone pain reliever. (R. at 524). On April 14, 2011, Liana D. Palacci, D.O., reviewed Plaintiff's file and performed an internal medicine consultative examination. (*Id.* at 512–15). She found no abnormal findings upon physical examination except a positive straight leg test on the left side, at 70 degrees in both the sitting and lying positions. (*Id.* at 514). Dr. Palacci assessed "complaints of low back pain with sciatic-like features" and a history of panic disorder. (*Id.* at 515). Later that month, a state reviewing physician, Dr. James Hinchen, read Dr. Palacci's report and other portions of Plaintiff's file and opined that Plaintiff had no severe physical impairment. (*Id.* at 961–63). His assessments were later

affirmed by Dr. Vidya Madala, another agency reviewer, in October 2011. (*Id.* at 519).

In November 2011 Plaintiff, who was then 25–28 weeks pregnant, suffered a placental abruption and had a baby boy delivered by emergency C-section. (R. at 875–85). According to a social worker who treated Plaintiff in 2012, the infant lived just 48 days and passed away in January 2012. (*Id.* at 635). Plaintiff's anxiety worsened after this event. (*Id.* at 56, 59).

On October 19, 2012, Plaintiff's primary care physician, Dr. Cordero, provided written opinions as to Plaintiff's mental and physical work-related mental activities. She indicated that she had treated Plaintiff for over two years and rated her capacities as "poor" in 17 of 22 listed work-related mental abilities, attributing her deficits to "extreme anxiety." (R. at 975–76). Among the capacities rated "poor" were Plaintiff's abilities to accept instruction and respond appropriately to criticism from supervisors, to get along with co-workers and peers, and to maintain socially appropriate behavior. (*Id.*). Dr. Cordero wrote that Plaintiff's psychological disorder was "not well treated," that she had been consistently difficult to treat due to her underlying anxiety disorder, and that she exhibited poor eye contact with disordered thinking and speaking. (*Id.*). Among Plaintiff's five abilities rated as "fair" was her ability to interact appropriately with the public. (*Id.* at 976).

Dr. Cordero also completed an assessment of Plaintiff's physical capacities, opining that, due to chronic low back pain, Plaintiff could lift no more than ten pounds occasionally and less than five pounds frequently, could stand or walk for less than

one hour total in an eight-hour workday, and that she could sit for an unlimited length of time but with frequent breaks. (R. at 977–78). She also opined that Plaintiff could never climb, stoop, kneel, crouch, crawl, or reach, and that she could only occasionally push, pull, or engage in gross or fine manipulation. (*Id.* at 977). November 2012 treatment notes from Dr. Cordero indicate that Plaintiff was still "working on finding a counselor" for her anxiety. (*Id.* at 950).

At the time of her hearing in June 2013, Plaintiff was 32 years old and lived with her parents and with her then 13-year-old son. (R. at 51–52). She testified that she had injured her lower back in a vehicle collision in 2007 and that it had been getting worse ever since. (*Id.* at 56). Her back pain had been treated with physical therapy, an injection, and pain medications which caused dizziness and drowsiness. (*Id.* at 57). She also had numbness in her left leg, and shooting pain in the left leg when seated. (*Id.*). She estimated that during the relevant period she could sit for 20 minutes, stand for 10 minutes, and walk for 5 minutes at a time. (*Id.* at 58). Her leg pain caused her to fall approximately once every two months. (*Id.* at 58). She had worked briefly at a McDonald's restaurant in 2011, but left due to back pain. (*Id.* at 53).

Plaintiff testified that her anxiety had been getting worse since the death of her infant son. (R. at 56, 59). She has anxiety and panic attacks when she sees babies or remembers what happened with her son, and she is awoken by nightmares about once a week. (*Id.* at 60). She takes Xanax three times a day, which helps but makes

her drowsy. (*Id.* at 60). She saw a counselor on and off for a couple of months. (*Id.* at 61). She remembers nothing from the year following her son's death. (*Id.* at 63–66).

Plaintiff's mother testified that Plaintiff moved in with her in 2010 and has lived with her since. (R. at 68). Plaintiff was very depressed after her son died. (*Id.* at 69). Other than medication, she received no counseling or other mental health treatment that her mother was aware of. (*Id.* at 71, 73). Plaintiff watched TV or stayed on her computer. She socialized only on the internet, though for a while, she also had a boyfriend and they would visit each other. (*Id.* at 70-71, 74). Plaintiff did her own laundry and could follow directions to complete household chores. (*Id.* at 71).

The VE described Plaintiff's past jobs as retail supervisor and restaurant manager as requiring a light physical exertion. (R. at 76). The ALJ then posed a series of hypothetical questions, first asking whether a person of Plaintiff's age, education, and work history could perform Plaintiff's past jobs if, because of mental impairments, she had the following work-related limitations: she could only do routine tasks following simple instructions, she could have no public interaction, and could make only simple work-related decisions. (*Id.* at 77–78). The VE opined that, while Plaintiff's past jobs would not be possible, other jobs exist that could be performed by a person with those restrictions, including small products assembler and bakery conveyor line worker, each having approximately 22,000 jobs in the state of Illinois, and office helper, with about 2,600 jobs in the state. (*Id.* at 77–79). Though the ALJ had not at that point included any physical restrictions in the hypothetical, the VE noted that all of the jobs she listed were at the light physical demand level. (*Id.* at

78). In a second hypothetical, the VE asked if those jobs would be available to one capable of only occasional contact with coworkers. The VE opined that this additional restriction would reduce the number of available positions in those three jobs by fifty to seventy-five percent. (*Id.* at 79).

The ALJ then asked if other jobs would be available to one with those mental restrictions plus the following physical and environmental restrictions: light work only; no climbing of ladders, ropes, or scaffolds; and no exposure to heights or hazards. (R. at 79–80). The VE responded that the positions of sorter and packager would be available. (*Id.* at 80). Jobs would not be available, however, if the person had absences in excess of seven to eight days a year, needed unscheduled 45-minute breaks, or was off task more than 10% of the work day. (*Id.* at 80–81). Upon questioning from Plaintiff's attorney, the VE acknowledged that adding "occasional contact with supervisors" to the limitations in the first two hypotheticals would "reduce the numbers even further to where there would be no employment positions." (*Id.* at 81).

## V. DISCUSSION

Plaintiff argues that the Court should remand for an award of benefits because evidence about her mental functioning necessarily leads to a finding that she is disabled. In the alternative, she requests remand for further proceedings based on (a) alleged errors in the physical RFC assessment; and (b) the ALJ's failure to consider her impairments in combination. Because the ALJ's errors leave several aspects of her RFC assessment in doubt, the matter must be remanded for new proceedings.

## A. The ALJ Erred in Her Analysis of Plaintiff's Mental RFC.

Plaintiff asserts that the ALJ erred in excluding from her RFC a limitation to only occasional contact with supervisors. She contends that the VE testimony establishes that, given her existing mental limitations, there are no jobs available for her in the regional or national economy, which must lead to a finding that she is disabled.

In Social Security disability claims, the opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *see Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016). Because of a treating doctor's "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th 2003), an ALJ must "offer good reasons for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016). Those reasons must be "supported by substantial evidence in the record." *Gudgel*, 345 F.3d 470.

Where the opinions of treating and nontreating physicians contradict one another, the ALJ must decide which doctor to believe, considering such factors as "the length, nature, extent of the treatment relationship; frequency of examination; [each] physician's specialty, the type of tests performed, and the consistency and supportability of [each] opinion." *Scott*, 647 F.3d at 740; *Books v. Chater*, 91 F.3d

972 (1996). The ALJ must then provide a "sound explanation" for that decision. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

Here, the ALJ considered and apparently rejected the opinions of two physicians as to Plaintiff's work-related mental capacities. Dr. Cordero, Plaintiff's treating physician, described Plaintiff as "extremely anxious" with a psychological disorder that was "not well treated." She rated Plaintiff as "poor" in almost all work-related capacities, including various abilities related to memory, concentration, consistency, and adaptation to normal workplace stresses. (R. at 975–76). She rated Plaintiff as "fair" in just a few capacities, including the ability to "interact appropriately with the public," and she did not rate Plaintiff as "excellent" or "good" at any work-related mental activity. (*Id.*).

The ALJ declined to credit Dr. Cordero's opinions "as they are not supported by the objective evidence from the period at issue." (R. at 34). She then faulted Dr. Cordero for failing to mention Plaintiff's marijuana usage. (*Id.*). The ALJ did not indicate which "objective evidence" conflicted with Dr. Cordero's assessments of Plaintiff's mental capacities. It is also unclear what relevance Plaintiff's marijuana usage has to the ALJ's analysis, as no portion of the questionnaire the doctor completed elicits information about Plaintiff's drug use, and no medical evidence of record exists that explains what effect, if any, the drug has on Plaintiff's physical or mental impairments. These two brief observations fall short of the "good reasons" required to reject a treating physician's opinion. And even if the ALJ had supplied good reasons for not giving controlling weight to the opinion, she would still be required to

provide a "sound explanation" of how she weighed the opinion, and each other opinion, in light of the regulatory factors set forth in 20 C.F.R. 404.1527(c), including the length and nature of Dr. Cordero's treatment relationship with Plaintiff. *Punzio,* 630 F.3d at 710.

Only one other opinion of record, the March 2011 assessment of reviewing psychologist Dr. Rozenfeld, addressed Plaintiff's work-related mental capacities. (R. at 508–10). In contrast to Dr. Cordero, Dr. Rozenfeld assessed Plaintiff as "not significantly limited" in most mental capacities related to work, finding "moderate limitations" in only four areas, all relating to abilities to work with the general public, coworkers, and supervisors. (*Id.* at 508–09). In her summary, Dr. Rozenfeld opined that Plaintiff retained sufficient capacities to perform "both simple and detailed tasks" and "to persist at and complete activities for extended periods" at a regular pace with "only the usual frequency and length of rest breaks." She concluded that "[Plaintiff's] ability to interact and get along with the general public, coworkers, and supervisors is moderately limited but adequate for occasional contact." (*Id.* at 509).

In an explicit rejection of Dr. Rozenfeld's opinion, the ALJ crafted an RFC limiting Plaintiff to "work involving simple instructions, routine tasks, and simple work-related decisions," explaining that the additional restrictions reflected a "benefit of the doubt" given to Plaintiff. (R. at 35). The ALJ does not explain which evidence or testimony she meant to credit with that statement. At best, there is conflicting evidence in the record about Plaintiff's cognitive skills. For example, though Dr. Cordero rated her ability to recall and carry out even simple instructions as "poor,"

she was able to count backwards by sevens, recall three of three items named after a five minute delay, repeat six digits forward and four backwards, and perform calculations in her consultative exam. (*Id.* at 492, 975).

The ALJ's opinion also lacks substantial evidence to support her RFC assessments regarding Plaintiff's capacity for work-related social functioning. Dr. Rozenfeld found Plaintiff capable of "occasional contact" with supervisors, coworkers, and the public alike, whereas Dr. Cordero rated her ability to interact with the general public as "fair" and her ability to accept criticism from supervisors as "poor." (R. at 579, 976). In contravention of both of these opinions, the ALJ assigned an RFC that allows for "no public interaction" and "occasional interaction with coworkers," with no limitation on her interactions with supervisors. (*Id.* at 23).

The Commissioner in her reply brief "concedes that the ALJ did not address the state agency psychologist's limits on occasional interaction with supervisors" and "asks the court to remand . . . to give the ALJ the opportunity to address this omission and explain whether she accepted or rejected those limits." (Dkt. 35 at 1). This is a puzzling concession. The ALJ did address Dr. Rozenfeld's assessments, and could not have made her rejection of those limits more plain: "I note that . . . Disability Determination Services found that [Plaintiff] should be limited to only occasional contact with supervisors, coworkers, and the public. However, I disagree." (R. at 33). The ALJ explained that she rejected the psychologist's findings because "as demonstrated especially by the consultative exam findings," Plaintiff "socialized appropriately despite her anxiety." (*Id.*). However, the ALJ does not indicate which

portion of Dr. Karr's report she found persuasive in this regard. The examiner referenced Plaintiff's relationship with her then-boyfriend, but also indicated that Plaintiff "goes out principally when she believes it is not crowded" and "states she becomes anxious around crowds and strangers," experiencing "tremors, dizziness, rapid [heartbeat], concentration problems, worry[,] and an inability to relax." Reviewing psychologist Dr. Rozenberg had access to the consultative examiner's report when she assessed Plaintiff's work-related capacities. Because an ALJ "may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record," *Boiles v. Barnhart,* 395 F.3d 421, 425 (citing *Clifford*, 227 F.3d at 870), it was improper for the ALJ to use the examiner's report to assess an entirely different set of mental limitations that those assessed by either her treating physician or the reviewing psychologist.

## B. The ALJ Did Not Adequately Explain How She Assessed Plaintiff's Physical RFC.

Plaintiff points to additional flaws that may have bearing on the assessment of the physical portion of Plaintiff's RFC. Dr. Cordero, opined that Plaintiff is capable of lifting up to ten pounds only occasionally, can stand for less than one hour of an eight-hour day, and can sit for an unlimited number of hours but with frequent breaks for standing. Together, these limitations would allow only a restricted range of sedentary employment. *See* SSR 96-7p, 1996 WL 374185 at *6 ("The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday.").

The ALJ did not credit Dr. Cordero's opinions, "as they are not supported by objective evidence from the period at issue." (R. at 34). The ALJ noted that Plaintiff's "physical abnormalities," as reflected in treatment notes from visits to Dr. Cordero and to the emergency room, "are quite limited." In characterizing Plaintiff's "physical abnormalities" as "quite limited," the ALJ does not address how she accounts for the numerous treatment notes referencing Plaintiff's low back pain and sciatica. The ALJ again failed to follow the treating-physician rule, discussed above, in her analysis of the medical opinion evidence.

The only other medical opinions of record were those of agency consultants Drs. Hinchen and Madala. Dr. Hinchen reviewed Plaintiff's 2007 MRI result and 2011 consultative exam report and found that on April 29, 2011, Plaintiff's impairments were nonsevere (R. at 963), meaning that they do not significantly limit her ability to do basic work activities, *see* 20 C.F.R. 404.1520(c). Dr. Hinchen's finding was affirmed by Dr. Madala in October 2011. (R. at 519). The ALJ "considered" those opinions, adding, "however, considering additional evidence and the hearing testimony, I find that [Plaintiff] had a severe physical impairment prior to her date last insured, and impose appropriate limitations." In sum, the ALJ rejected the opinions of both the treating physician and the agency reviewers in favor of "additional evidence" and the testimony of Plaintiff and her mother at the hearing. However, the ALJ does not point to which "additional evidence" she relied on to arrive at her conclusion that Plaintiff could stand up to six hours per day, lift up to 20 pounds at a

time, and frequently lift up to 10 pounds, which are the exertional demands associated with light work.

Plaintiff also argues that the ALJ erred in failing to consider her impairments in combination. Because Plaintiff does not show that her impairments in combination would meet or equal a Listings-level impairment, this argument is also best considered in light of the re-assessment of Plaintiff's RFC. The ALJ should also account for Plaintiff's numerous falls, as documented in several emergency room visits not discussed here, especially in light of her testimony that the falls are caused by leg pain associated with her sciatica. (R. at 58).

## C. Remedy

When reviewing a denial of disability benefits, a court may "affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing 42 U.S.C. § 405(g)). The court may reverse with an instruction to award benefits only if "all factual issues have been resolved and the record can yield but one supportable conclusion." *Briscoe*, 425 F.3d at 355 (citation omitted).

Plaintiff contends that, based on uncontradicted medical opinion evidence, the ALJ should have included a limitation to "occasional contact with supervisors" in her RFC assessment, and that doing so would unquestionably yield a determination of disability. Were the omission of "occasional contact with supervisors" the only error in the ALJ's mental RFC analysis, Plaintiff might well be correct. The VE hypothetical posed by Plaintiff's attorney built on the ALJ's second hypothetical, which

referenced only the mental restrictions found in the ALJ's RFC assessment,[3] and added the restriction of "occasional contact with supervisors." The VE opined that no jobs would be available to a person with that set of mental restrictions; therefore, a finding a disability would be appropriate. (R. at 81).

However, Plaintiff's ability to interact with supervisors is not the only open question of fact in the RFC determination below. As discussed above, the ALJ failed to explain why she limited Plaintiff to no public contact, a greater restriction than that suggested by the medical evidence. She failed to explain why she limited Plaintiff to "routine and simple tasks," again reflecting less ability than that which Dr. Rozenfeld assessed after reviewing Dr. Karr's report. Moreover, the physical RFC assessment also suffers from several flaws, including a failure to properly follow the treating physician rule. Because several factual issues remain unresolved, the Court cannot say with confidence that a re-evaluation of the evidence in the file would lead to "but one supportable conclusion." *Briscoe*, 425 F.3d at 355. For example, the VE did not opine as to whether there would be any jobs available for an individual who was restricted to both occasional contact with supervisors and *occasional contact with the public*. This matter must therefore be remanded for a re-assessment of Plaintiff's physical and mental RFC in a manner consistent with this opinion.

---

[3] While the vocational expert referred only to jobs at the "light" exertional demand level throughout her testimony, the ALJ did not actually posit any exertional or environmental restrictions until the third hypothetical.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment is **Granted in Part and Denied in Part,** and Defendant's motion for summary judgment is **Granted**. Pursuant to sentence four of 42 U.S.C. § 405, the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: August 24, 2016

_____
MARY M. ROWLAND
United States Magistrate Judge